(C. D. 834)

J. A. KIRSCH, LTD. *v.* UNITED STATES

United States Customs Court, Third Division

(Decided March 2, 1944)

*Strauss & Hedges; Barnes, Richardson & Colburn* (*J. Bradley Colburn* of counsel) for the plaintiff.

*Paul P. Rao,* Assistant Attorney General (*Richard H. Welsh* and *Arthur R. Martoccia,* special attorneys), for the defendant.

Before CLINE, KEEFE, and EKWALL, Judges

CLINE, Judge: This is an action against the United States to recover a part of the duty assessed on Dalmatian sour cherries imported in kegs or small barrels. Duty was assessed by the collector at the rate of 2 cents per pound under the provision for "Cherries: (1) In their natural state" in paragraph 737 of the Tariff Act of 1930 and the plaintiff claims that duty should have been assessed at only 1 cent per pound under the same paragraph, as modified by the trade agreement with Canada, T. D. 49752. The provision in the trade agreement reads as follows:

Par. 737
 Cherries:
  (1) In their natural state, not in air-tight or water-tight containers_____ 1¢ per lb.

Seven protests, covering eight entries of merchandise, were consolidated for trial. The sole question before the court is whether the

kegs or small barrels in the shipments were airtight or watertight containers. The plaintiff moved to incorporate the record in *J. A. Kirsch, Ltd.* v. *United States,* 8 Cust. Ct. 254, C. D. 616, which covered similar merchandise imported by the same firm, and the motion was granted. The evidence in that case was summarized in that decision as follows:

The plaintiff introduced the testimony of three witnesses. Mr. Jacob A. Kirsch, who is connected with the importing company, testified that the shipment herein involved consisted of 200 kegs of Dalmatian sour cherries; that he bought the merchandise and inspected it at the pier when it was landed; that a large number of the kegs were in a leaking condition with the juice seeping through the seams of the kegs; that the specifications under which he purchased the cherries were that they were to be packed in kegs containing 110 pounds net and nothing was to be added to them; that he had opened some of the kegs and found some liquid inside which consisted of the natural juice from the cherries; that he had been importing such goods for almost 40 years; that on the Monday before the day of trial (which was held on Wednesday) he visited one of his customers and obtained two kegs out of this particular shipment; that he personally saw the cherries in the kegs emptied into a vat and he brought two kegs back with him. One of those kegs was received in evidence and marked exhibit 1.

The witness testified further that the keg contains stains between the staves showing that juice leaked through; that he tested it with water and found that it was not watertight; that when he buys cherries he specifies that he wants them in new kegs and when he finds the cherry juice is seeping through the seams he knows that the kegs are leaking; that at the time of importation the color of the juice seeping through the seams was bright red but that color had faded in this exhibit; that cherry juice, because of its sugar content, thickens and does not seep through the seams as freely as water; that, based on his experience, the kegs represented by exhibit 1 are not airtight or watertight containers.

The witness testified further that the same kind of cherries are imported into this country in hermetically sealed tins containing a net quantity of about 20 pounds.

The next witness called by the plaintiff was Mr. Bernard Karp who is a warehouseman in a Government bonded warehouse. He testified that he had stored many thousands of kegs of Dalmatian sour cherries during the past 5 years; that he examines all merchandise to see if it is in bad order, leaking or torn, and he has a special place for such cherries in the cellar where they will not dirty other goods; that he has stored such goods for J. A. Kirsch, Ltd., and found a good portion of them were in a leaking condition; that the kegs he stored were of the same character as exhibit 1 and in his experience he would not consider them airtight or watertight.

The next witness for the plaintiff was Mr. Sol M. Wolff who is connected with Segal Brokerage Co., importers and domestic agents of food products. He testified that his firm represents the foremost packers of Dalmatian sour cherries in Yugoslavia and that he is familiar with such cherries; that he examines the merchandise on the pier and in practically all shipments of Dalmatian sour cherries in kegs he has noticed a seepage of the juice; that he has sold such cherries in hermetically sealed tin containing 20 pounds net and that, based on his experience, such tin containers are airtight and watertight; that, if the kegs containing such cherries were airtight or watertight, it would be impossible for the juice to seep through.

Mr. Frank W. Woldering, an inspector of customs, appeared in behalf of the defendant. He testified that it is his duty to weigh cargo on the piers; that in

that work he has become acquainted with Dalmatian sour cherries imported in kegs like exhibit 1; that he weighed the shipment covered by the protest in this case and sampled it; that he made no notations concerning the condition of the merchandise and did not recall in this particular instance the condition of the shipment; that he made out a sample ticket but he is not required to report the condition of the merchandise on such ticket; that he had inspected and sampled Dalmatian cherries in kegs like exhibit 1 approximately 40 or 50 times and he had noticed leakage or seepage from such kegs.

At the trial of the instant cases the plaintiff called the importer, Mr. Jacob A. Kirsch, whose testimony is also contained in the incorporated record. He testified that he saw the merchandise covered by all of the entries, either on the pier or in the warehouse; that the majority of the barrels was leaking; that the leaking barrels constituted 75 or 85 per centum of the importations; that he did not test any of the barrels to determine whether they were airtight or watertight.

On cross-examination he admitted that the test made of the barrel covered by the incorporated record occurred a year and three months after importation; that it is his practice to open about five barrels in each shipment and inspect the contents and his examination of the balance of the shipments consisted of looking at the barrels, without handling them, and he could see that the majority of them was leaking.

On redirect examination the witness testified that he did not consider the kegs in which Dalmatian cherries are imported to be airtight or watertight; that he based his opinion on the fact that they were leaking and also on the construction of the kegs.

On recross-examination the witness testified that, as far as he knew, there was but one shipment of Dalmatian cherries in tins and one sample was shown him with an offer to sell him cherries in that condition.

The defendant then called thirteen inspectors of customs. Eight of these witnesses testified that they weighed the merchandise on the pier at the time of importation and the others testified that they supervised the loading and unloading of the vessels and signed the papers relating to the release of the goods, but actually did not see the kegs. All of the weighers, except one, weighed the kegs on a beam scale in drafts of two or four kegs and each keg weighed was inspected separately, but those men weighed only a portion of the shipments, their testimony being limited to 20 or 40 out of 100 kegs and 60 or 80 out of 200 kegs. One witness, Mr. Joseph E. Johnston, used an automatic electric scale and weighed 100 or 200 kegs on a truck at a time. He testified that he inspected the goods by looking at them on the truck. None of these witnesses found any leakage in the kegs, but one—Mr. John R. Leahy—found 4 kegs out of 60 he weighed upon which stains were visible and made a notation thereof on his dock book, but he testified that those 4 kegs were not leaking. The weighers all testified that if the kegs had been leaking it was their duty to make

notation thereof on the dock book but no such notations were made. A few of these weighers testified that they had no present recollection of the shipments and based their testimony on the dock-book records only.

The weighers produced the dock books showing the weights of the merchandise in the various shipments herein involved, and pages from the dock books relating to the weights on these shipments were received in evidence. The other five inspectors, who did not actually see the merchandise, produced the official permits, transfer tickets, and steamship tally sheets which came under their observation at the time the goods were released. All of these documents were received in evidence and marked defendant's exhibits 1 to 21. The statements on defendant's exhibits 2, 6, 15, and 17, to the effect that the merchandise was received or delivered in good order, were stricken out on motion by counsel for the plaintiff. The statement "13 bbls. stained" on the tally sheets in exhibit 18 was also stricken out and the statement "Kegs not airtight or watertight containers" on the permit marked defendant's exhibit 12 was also stricken out on motion by counsel for the plaintiff.

Mr. Samuel Maslow was called in rebuttal by the plaintiff. He testified that he is engaged in cooperage of steel drums and wooden barrels and has been so engaged ever since 1907; that he buys barrels, coopers them, and sells them in good condition; that he handles milk, oil, cherry, strawberry, fruit, wine, beer, shellac, and juice barrels; that an airtight or watertight barrel is made from jointed staves, round, made of good lumber and properly made; that such barrels are not necessarily made from hardwood, but some softwood barrels are made into tight packages; that the wood has to be seasoned and dried properly so that it does not shrink much after it is made up; that flagging is put in the barrel at times where the staves are being jointed. The witness was shown exhibit 1 in the incorporated record and he testified that he has had such barrels offered to him but never bought them because they are very flimsily made packages and in his opinion could not be made tight enough for any liquid; that in his opinion the barrel is not an airtight or watertight container. When asked for the reasons for that opinion, he said:

A. Well, the barrel made here is—usually these staves are jointed. It comes out round. This package here is made most probably by hand, and it has the staves cut and made into a package which comes out not round but flimsy, and these joints always open up. In my opinion, I don't think that that package could ever be made very tight. It is the form of making it, see? The wood could be made into a tight package, but not this type of make, you couldn't make it very tight. That is my opinion about it.

The witness testified further that the wood is some sort of beech which is not considered in the family of hard woods; that he could not say whether or not it was seasoned when it was made up; that it is the

common practice in the cooperage trade to apply some form of lining to barrels which are to be used for airtight or watertight purposes; that some barrels are lined with paraffin to avoid discoloration of the product with the wood, or smell of wood; that for edible goods such as oils, lards, milk, etc., silicate is used for lining; that when lining is applied it also accomplishes the purpose of sealing the inside of the package; that there is no lining in exhibit 1; that if the staves are not properly jointed a barrel will sometimes show a leak; that the staves in exhibit 1 are not properly jointed; that they are planed inside, "but I don't know whether I would call it proper"; that he would consider the exhibit a one-time shipper because there is no sale for such a barrel; that if a barrel was originally made airtight or watertight it could always be brought back to that condition. When asked if the exhibit could be made into an airtight or watertight container, he said:

A. Well, I don't know whether this could be made into a good package.

Q. Do you have any opinion on it?—A. I never tried it, never used them, never tried to make one tight out of any of these packages.

Q. It is your business, isn't it?—A. Yes, but we have never made it.

Q. Why?—A. Never handled it, never had a sale for them.

Q. Why is that?—A. We sell kegs from 5 to 30 gallons, and there was always a sale for them for liquid, while these here packages have never been sold for a liquid.

Q. And why have they never been sold for a liquid?—A. I don't think they make good packages, that is why.

Q. Is that the trade reason or not?—A. That is the trade reason, I think.

Q. Has that been your experience?—A. We sell kegs for pickles that have a brine in them, we make them tight. This has never been used for that.

Q. Then I ask you again if that be so could the exhibit 1 be made into a tight, airtight or watertight container?—A. As I said, I don't think so. We never tried it.

The witness testified further that he had handled and reconditioned barrels which were considered to be airtight or watertight containers and he produced such a barrel which was marked plaintiff's illustrative exhibit 22. When asked to point out the reasons why the illustrative exhibit was considered by him to be an airtight or watertight container, he testified that it is round, the joints inside the barrel are tight, as they are on the outside, and it is closed right and has better hoops; that such a barrel represents the type of package that he sells as an airtight or watertight container; that slack barrels are made out of softwood and are used for powder, chemicals, sugar, dry color, and similar products; that some parts of exhibit 1 in the incorporated record have flagging around the heads; that the barrel was probably intended for a tight barrel but that it is not tight now; that barrels in which cherries in brine are shipped are not like exhibit 1.

On cross-examination the witness testified that slack barrels are made of gum staves and are tongued and grooved, mostly, and put together with iron hoops or wooden hoops; that a slack barrel cannot

be made watertight; that evidently the purpose of flagging exhibit 1 was probably to make it tight; that he would not call it a slack barrel and he would not call it airtight or watertight; that it is between a tight barrel and a slack barrel, but he does not know of any type of barrel in the trade besides a tight barrel and a slack barrel. He said:

Number 1, is not generally the type of package that we handle here. We are not accustomed or acquainted with it because we do not handle it. We don't cooper it; we don't buy or sell it. It is not even made, any such type of package, in this country. If the honorable counselor wants to know what type of package and insists upon knowing this I have no name for it.

The witness testified further that the purpose of the flagging in exhibit 1 was to make it tight; that the staves are jointed all right but whether they are tight is another thing; that the staves are smooth and are jointed. He picked out four pieces of flagging from the exhibit and they were admitted in evidence and marked defendant's collective exhibit 23. He testified further that the barrel, exhibit 1, is now pretty well dilapidated and it is possible that the flagging could have fallen out; that in his opinion the barrel was not designed and constructed as a watertight or an airtight barrel; that it was designed for a product such as a dried cherry, the little flagging being probably put in to preserve whatever juice the cherries may give out by themselves; that if it was a slack barrel the flagging would not prevent the juice from leaking out.

X Q. It had to be a tight barrel or the flagging would be no good?—A. Well, probably this is the type of barrel that they would call tight; I don't know.

On redirect examination the witness testified that the amount of flagging he found in exhibit 1 would not be sufficient in a tight barrel as he understood it in the trade in the United States; that it is not customary to put flagging between every stave in a tight barrel at the time of its manufacture; that it is only when the barrel is being re-coopered or reconditioned that flagging is done, but a little flagging is put in when it is new if found necessary.

On examination by Judge Keefe the witness testified that the staves in exhibit 1 were cut with a knife and not planed, while those on illustrative exhibit 22 were planed by machine; that in America no barrels are manufactured by hand.

Mr. Jacob A. Kirsch was recalled by the plaintiff. He testified that, at the request of some of his customers, he endeavored to find a purchaser for some of the empty barrels in which Dalmatian cherries are imported but was unable to do so; that the barrel dealers claimed that they were worthless because the cost of putting them in condition to be airtight and watertight would be so great that it would not pay to handle them; that he was of opinion that the kegs were not airtight and watertight because they were in a leaking condition when imported and they could not be sold as tight barrels; that he had received a number of complaints from his customers that there was a

shortage in weight because the barrels were leaking or that the air leaking in had dried the cherries.

On cross-examination the witness testified that the steamship company puts a notation on every bill of lading covering Dalmatian cherries reading "Not responsible for leakage" and such a notation does not appear on bills of lading covering barrels of other merchandise; that when a shipment of Dalmatian cherries comes in you can see the leakage, the floors are all wet, the juice is all over the floors, and there is a shortage in the weight; that the shippers put more than 110 pounds in each keg in order to avoid any question of claims, and yet when they get here he had never seen a keg which would weigh 110 pounds and that is why he gets refunds from the Government all the time, because the barrels do not contain 110 pounds which is the entered weight; that he has never made barrels but he knew a little about it. When asked what was the purpose of the flagging in exhibit 1 in the incorporated record, he said:

A. The purpose of the flagging in exhibit 1 is because they apparently take a package constructed so that it could just about last for its trip and they may make a test of it and if it shows leakage in certain parts of the barrel they may put a little flagging in.

Mr. Victor Dumbra, who is connected with Tiara Products Co., a wine producer, was the next witness called in behalf of the plaintiff. He testified that it is a requisite that all containers of wine be watertight and airtight; that he has bought fruit juice and dried cherries in containers like exhibit 1 in the incorporated record, some of which he purchased from Mr. Kirsch; that he would not allow a liquid to go into a barrel of that type because it is not an airtight or watertight barrel; that the wood itself and the make-up of the barrel would not make an airtight container; that the barrels of Dalmatian cherries he purchases from Mr. Kirsch are usually very wet and are leaking.

On cross-examination the witness testified that he has put barrels together and has coopered them; that a slack barrel is one to hold dry materials and a tight barrel is used to hold liquids without leaking; that he would not say definitely that exhibit 1 was not a tight barrel but he would not put water, wine, or any liquid into a barrel of that nature; that when such barrels first arrive they seem tight but he never knew of a barrel that would not leak at one time or another; that, when a barrel leaks, he tightens it or flags it or keeps it where it will not get too dry; that he uses lampwicking to stop a leak in a barrel but that will not make an airtight barrel but would make a leakproof barrel at the moment; that exhibit 1, in its original condition, would be a barrel that would carry a solid or a semiliquid, but not a liquid; that it is not designed to be a tight barrel; that if a barrel was not designed to be a tight barrel the juice would evaporate into the wood and would expand the barrel to the level where the moisture

might touch; that if the barrel had been paraffined the juice would not have been absorbed into the wood. The witness examined exhibit 1 and testified that the wood had absorbed the liquid.

The defendant offered the testimony of three witnesses in surrebuttal— Mr. Alvin W. Nelson, the superintendent of the Brooklyn Cooperage Co., Mr. Michael J. Carpinello, a cooper and official inspector as to the condition of packages and a weigher and sampler licensed by the New York Produce Exchange, and Mr. Nathan Arthur Lebowich, vice president of the Acme Steel Drum Co. These witnesses have had experience in the cooperage business of from 20 to 39 years. The witnesses testified that barrels like exhibit 1 in the incorporated case were originally designed and constructed to be airtight and watertight containers, giving as reasons for their opinion the fact that they are made of hardwood; that the staves are substantial; that the heads were set in the barrel so as to make a tight joint; that flagging, which is used to fill small crevices or openings in barrels to prevent leakage, is found between the staves and in the heads. The witnesses testified further that they had seen imported Greek olives in brine in barrels identical with exhibit 1; that there are but two kinds of barrels, namely tight and slack; that a lining of paraffin or of silicate is put in tight barrels to protect the contents from the taste or smell of the wood, but many kinds of tight barrels contain no lining; that although exhibit 1 is now in a dilapidated condition, due to drying out and the loosening of the hoops, it could be made into an airtight or watertight container; that a slack barrel which is designed to hold powders, sugar, flour, etc., could never be made tight; that the exhibit is a hand-made barrel while those made in this country are produced by machinery and present a better appearance; that the man who made it used a hand joiner but the staves are flat along the middle and would make a tight juncture; that the staves used in this country are concave and convex and such staves make a neater looking package, while the exhibit is crude in construction and appearance; that a tight barrel will leak after it is kept in a warm dry room.

The statement of witness Kirsch that he always gets a refund from the Government because the Government weighers find less merchandise than is entered is not borne out by the record, as an inspection of the entries covered by protests 8781–K, 23112–K, 48028–K, and entry 37451 covered by protest 27861–K shows that duty at 2 cents per pound was assessed on the cherries at the entered weights.

No expert coopers testified in the case of *J. A. Kirsch, Ltd.* v. *United States, supra,* the record of which was incorporated in the record in the instant cases, and the decision rested on the statements of the witnesses to the effect that the barrels were leaking at the time of importation and upon an ocular examination of the sample by the court. It was

held that barrels which were generally imported in a leaking condition were not airtight or watertight. It was brought out in the present record that the barrel which was admitted in evidence as exhibit 1 in that case, and which was tested by Mr. Kirsch as to its watertight condition, had been imported a year and three months prior to the time the test was made by Mr. Kirsch. Under such circumstances a tight barrel which contained but 2 pounds of juice, as Mr. Kirsch testified in the incorporated case with respect to the barrels of Dalmatian cherries, might dry out in warehouse in this country during that period of time after importation, and the test he made would not disclose the condition of the barrel at the time of importation.

The testimony as to the imported condition of the kegs is in direct conflict. Mr. Kirsch testified that he examined them either on the pier or in warehouse and found that 75 to 85 per centum of them were leaking. On the other hand, the eight customs inspectors who weighed the merchandise on the pier testified that none of the barrels which came under their observation at the time of weighing appeared to be leaking. It is true that seven of those inspectors who used the beam scale for weighing did not see the entire shipment, as they weighed 20 or 40 kegs out of 100 or 60 or 80 out of a shipment of 200 kegs, but it would seem improbable that all of those which they did not weigh were leaking. It was testified that the laborers who put the barrels on the scales started at the edge of the pile and worked through until a sufficient number of barrels was weighed. The one weigher who used the automatic electric scale and weighed a truck load of kegs at a time examined only the kegs which were on the outside of the truck. The weighers were instructed to make a record on the dock books if any of the merchandise was in bad order, and it appears from an examination of the dock books that no notations of bad order were made, except that 4 kegs out of 60 weighed in one shipment were stained, and the weigher testified that those 4 kegs were not leaking. Mr. Kirsch made no record of the leaking kegs which he observed at the time of examination and testified merely from memory. The entries were made in 1939 and 1940 and his testimony was given in October 1942, more than 2 years after entry. We are of opinion that the plaintiff's testimony is not sufficient to overcome that of the Government officers who made their records before the shipments were removed from the piers.

An examination of the expert testimony offered by the plaintiff shows but one of its witnesses, Mr. Maslow, was in the cooperage business, but he admitted that he never handled barrels like exhibit 1 in the incorporated case. Although he expressed the opinion that it was not an airtight or watertight container, he admitted on cross-examination that "probably this is the type of barrel that they would call tight; I don't know." Mr. Kirsch and his other witness, Mr.

Dumbra, were not barrel manufacturers or expert coopers and their opinion that the exhibit is not an airtight or watertight container is of negligible weight. Mr. Dumbra admitted that the same kind of barrels was used to hold fruit juices. On the other hand, defendant's three well-qualified barrel manufacturers and coopers testified that the representative barrel, exhibit 1 in the incorporated record, was designed and constructed to be an airtight and watertight barrel. We are of opinion that the weight of evidence is to the effect that the type of barrels herein involved was airtight and watertight at the time of construction. There is no evidence in the record tending to show that they were in any other condition at the time of shipment or at the time the cherries were packed.

The plaintiff cites T. D. 44253 and *Moscahlades Bros.* v. *United States,* 73 Treas. Dec. 325, T. D. 49417. In T. D. 44253 the Treasury Department held that condensed milk packed in barrels which were made tight and were well bunged was not dutiable under the provision for condensed or evaporated milk "In airtight containers" in paragraph 708 of the Tariff Act of 1930. In the *Moscahlades Bros.* case, *supra,* the court held that boiled salmon roe imported in wooden barrels, which were completely calked and sealed with wax, was dutiable under the provision for fish roe "packed in airtight containers" in paragraph 721 (d) of the Tariff Act of 1930. No ruling principle can be derived from the above cases because here the provision under consideration is broader than those considered and covers cherries in their natural state, in airtight *or* watertight containers. There was no provision for goods in watertight containers in the paragraph involved in those cases.

It would seem from an examination of the trade agreement with Canada (T. D. 49752) that the negotiators had the method of packing in mind when the phrase "not in airtight or watertight containers" was used in paragraph 737. From all that appears in the record the cherries in the instant cases were packed in airtight or watertight containers. The fact that some of the kegs might have sprung a leak during the voyage of importation, or after importation, would therefore not be determinative of the issue. If the court should hold that cherries in kegs which arrived in this country in a sound condition were dutiable at 2 cents a pound and the same kind of cherries in the same kind of kegs which arrived in a leaking or broken condition was dutiable at 1 cent per pound, such holding would not be consistent with well-established rules of tariff construction.

The evidence adduced in the instant cases results in a different conclusion from that determined in *J. A. Kirsch, Ltd.* v. *United States, supra.*

The protests are overruled. Judgment will be rendered in favor of the defendant.